**2019 UT App 59**

## THE UTAH COURT OF APPEALS

JAMES B. LAYTON,
Petitioner,

*v.*

LABOR COMMISSION, WORKERS COMPENSATION FUND,
WINKEL DISTRIBUTING COMPANY, AND FEDERATED
MUTUAL INSURANCE COMPANY,
Respondents.

Opinion
No. 20180074-CA
Filed April 18, 2019

Original Proceeding in this Court

Benjamin T. Davis and Stony V. Olsen, Attorneys
for Petitioner

Hans M. Scheffler, Attorney for Respondents
Workers Compensation Fund and Winkel
Distributing Company

Ford G. Scalley and Joseph A. Skinner, Attorneys for
Respondents Winkel Distributing Company and
Federated Mutual Insurance Company

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

HARRIS, Judge:

¶1     In administrative proceedings before the Labor
Commission of Utah (the Commission), James B. Layton
sought workers compensation benefits for lower back
problems that he attributes to four separate workplace incidents,
all of which occurred while he was employed by Winkel
Distributing Company (Winkel). The Commission awarded
Layton benefits for the first three incidents, but it denied benefits

for the fourth (the 2015 Incident). In denying the fourth claim, the Commission determined that Layton had not proved that his injuries were legally caused by the 2015 Incident. Layton now seeks judicial review of that decision, and we decline to disturb it.

BACKGROUND

¶2      Over a period of eight years, Layton worked for Winkel as a beer delivery driver, a job that often required Layton to lift heavy kegs of beer. During this time span, Layton injured himself in four separate workplace incidents—each involving his lower back—while in the course of making beer deliveries.

¶3      The first injury occurred in April 2007, when Layton, while holding a door closed with his left hand, used his right hand to lower a 120-pound beer keg approximately three feet to the ground. During the process, Layton felt a sharp pain in the middle of his back. He visited a doctor that same day, and was diagnosed with "a lumbar sprain/strain with muscle spasms, radiculopathy and left leg pain." Layton underwent twelve chiropractic treatments, after which he noted "no back pain and only some persistent muscle tightness." Later that year, Layton visited another doctor with a complaint of numbness in his leg; the doctor performed a physical exam but did not find any issues. Then, in November of that same year, a spine x-ray was taken that revealed "mild to moderate rotoscoliosis." Layton reported that, while his left leg symptoms had resolved, he was still experiencing pain in his lower back. Despite weekly medication treatments, Layton continued to experience lower back pain while sitting for long periods of time.

¶4      The second injury occurred in July 2010, when Layton lifted a 120-pound beer keg into his truck. As he was lifting the keg, he twisted his body and felt a sharp pain in his lower back. He visited another doctor and was again diagnosed with a

lumbar strain. A lumbar spine x-ray taken the following week revealed "mild degenerative changes at L4–L5."

¶5 The third injury occurred in December 2012, when Layton slipped on ice and fell while in the process of transferring a forty-pound mini keg from his delivery truck to a hand truck. During the fall, Layton felt immediate pain in his lower back, which he later described as being "constant, mild in severity, moderate in intensity, sharp, throbbing, aching and stabbing." A lumbar spine x-ray taken after the incident revealed "disc osteophytes of L4–5 and L5–S1 consistent with degenerative disc disease [(DDD)]," a preexisting condition in which pain is caused by a spinal disc that loses integrity. The injury was diagnosed as a "lumbar strain." Layton was prescribed medication and underwent seventeen chiropractic treatments.

¶6 The fourth injury—the 2015 Incident—occurred in January 2015, when Layton lifted an 18-pack case of beer, weighing approximately nineteen pounds, off a chest-height stack. After lifting the case with his arms outstretched in front of his torso, Layton began to pull the case toward his chest, at which point he felt "an immediate electrical sensation travel down his back" and into his legs, causing him to fall to the ground where he was immobilized for a number of minutes.

¶7 Following the 2015 Incident, Layton visited a number of doctors seeking treatment for his lower back. In February 2015, a lumbar spine MRI revealed a number of problems, all of which "would be consistent with limited [DDD] of the lumbar spine." After reviewing the MRI, Layton's doctor recommended against surgery and diagnosed him with "chronic back pain, stenosis at L4–5, and disc herniations." In May 2015, a medical consultant for WCF Mutual Insurance Company (WCF)—Winkel's insurance carrier for the first three incidents—evaluated Layton's case. The consultant, a medical doctor, opined that the 2015 Incident "resulted in an

acute injury" and that the first three incidents had caused injuries that were "temporary aggravations" of Layton's DDD.

¶8    During the next few months, Layton's symptoms did not improve and he continued to manage his pain by taking pain medication and receiving "medial-branch blocks on the left side of his lumbar spine." Although the treatments provided some relief, they did not completely eliminate the pain. In August 2015, Layton's primary care provider, a family-practice physician assistant, opined that the 2015 Incident contributed to Layton's lower back condition. He further opined that "a preexisting condition contributed to" Layton's 2015 injury. He referred Layton to a neurosurgeon who concluded that conservative care of Layton's back had failed and that surgery was necessary to treat his DDD. Layton underwent surgery to treat his lumbar spine in October 2015.

¶9    Following the surgery, in July 2016, Federated Mutual Insurance Company (Federated)—Winkel's insurance carrier for the 2015 Incident—referred Layton to its medical consultant for a second evaluation. This consultant, a doctor in neurology and psychiatry, opined that the 2015 Incident "was a temporary aggravation" of Layton's "preexisting lumbar spine condition." He explained that Layton's October 2015 surgery had not been necessary, industrially speaking, because the 2015 injury was "temporary in nature." He also noted that the 2015 injury "had improved 70% by March 2015," and that another doctor had described Layton's injury as "mild" in April 2015. In October 2016, WCF referred Layton's case to yet another medical consultant, this one a doctor of occupational medicine, for a third evaluation. He concluded that the first three industrial incidents medically caused Layton to suffer lower back strains. He also opined that the 2015 Incident "did not result in any new injury" to Layton and that the lumbar spine surgery in October 2015 "was not necessary on an industrial basis."

¶10    In January 2016, Layton filed a claim seeking workers' compensation benefits for injuries sustained in all four workplace incidents. The matter proceeded to an evidentiary hearing before an administrative law judge (ALJ), after which the ALJ ordered that the medical issues be referred to an impartial medical panel (the Panel) for consideration.

¶11    The Panel was comprised of two medical doctors, one a doctor in occupational medicine and the other a general surgeon. After examining Layton and reviewing his medical records, the Panel determined that Layton had suffered lower back strains as a result of each incident. However, the Panel also determined that Layton suffers from DDD "as an underlying preexisting condition," and that Layton's DDD "was not the result of any of the four back injuries," although it acknowledged that "those injuries may have temporarily aggravated the preexisting DDD."

¶12    Layton objected to the Panel's final report, but the ALJ overruled the objection and admitted the report into evidence. Relying on both the Panel's report and the other evidence in the record, including the medical opinions of numerous physicians, the ALJ concluded that Layton suffers from DDD that was not caused by any of his industrial incidents, stating that "no evidence demonstrates that [Layton's] preexisting condition is attributable to his industrial injuries." Indeed, the ALJ found that Layton's preexisting DDD instead had contributed to at least his 2010, 2012, and 2015 industrial injuries.[1] Therefore, under applicable Utah law, to receive compensation for these injuries, Layton was required to make a heightened showing in order to prove that his injuries were legally caused by the incidents

---

1. Although there was conflicting testimony regarding whether Layton suffered from DDD at the time of the 2007 incident, the ALJ deemed the distinction unimportant as Layton could easily prove legal causation for this incident using either the regular standard or the higher standard. *See infra* ¶ 18.

(rather than by his preexisting condition).[2] The ALJ then determined that Layton could make the heightened showing for the first three industrial incidents, but that he had not done so with regard to the 2015 Incident. Accordingly, the ALJ awarded Layton compensation for injuries sustained in the first three incidents, but not for injuries sustained in the fourth.

¶13   Layton appealed the ALJ's decision regarding the 2015 Incident to the Commission. Despite prevailing on his claims regarding the first three incidents, Layton asked the Commission to reverse the ALJ's decision regarding the 2015 Incident, because it prevented him from obtaining compensation for ongoing care and treatment, including the October 2015 surgery, of his DDD. In his appeal to the Commission, Layton conceded that he had been suffering from a preexisting condition at the time of the 2015 Incident, and did not claim to be able to prove legal causation under the higher standard. But he argued, among other things, that he could demonstrate causation under the usual standard, and asserted that the ALJ erred in requiring him to make the heightened showing with regard to the 2015 Incident. After review, the Commission concluded that the issue of legal causation was dispositive of Layton's 2015 claim and that the ALJ had applied the correct standard to that claim. Given Layton's acknowledgment that he was unable to prove legal causation under the heightened standard, the Commission affirmed the ALJ's decision to deny Layton's claim for compensation stemming from the 2015 Incident. Shortly thereafter, Layton filed a motion for reconsideration of the Commission's decision, which the Commission denied.

---

2. As we explain below, this higher standard is required by our supreme court's decision in *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986), in which the court held that "where the claimant suffers from a preexisting condition which contributes to the injury, an unusual or extraordinary exertion is required to prove legal causation." *Id.* at 25–26.

ISSUE AND STANDARD OF REVIEW

¶14    Layton now seeks judicial review of the Commission's decision, and he asks us to set aside its determination that the 2015 Incident was not compensable due to lack of legal causation. Although Layton concedes that he cannot show legal causation under the higher standard, he contends that the Commission erred in its decision to apply the higher standard, and therefore it erroneously concluded that his injuries were not legally caused by the 2015 Incident. As we explain below, the question about which standard to apply—the usual one or the heightened one—is driven by a factual inquiry, namely, whether Layton's DDD was caused by any of the four workplace incidents. The Commission answered that factual question in the negative, crediting the Panel's finding that Layton's DDD "was not the result of any of the four back injuries." We afford "substantial deference" to the Commission's factual findings, and will not disturb them unless Layton "demonstrates that a finding is not supported by substantial evidence." *Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 11, 339 P.3d 624 (quotation simplified). "In conducting a substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable." *Id.* (quotation simplified). Rather, we defer to the Commission's findings "because when reasonably conflicting views arise, it is the fact-finder's province to draw the inferences and resolve these conflicts." *Id.* (quotation simplified).

ANALYSIS

¶15    Layton's argument that the Commission erred is premised on his contention that the Commission applied the wrong standard for evaluating legal causation when it determined that the 2015 Incident was not compensable. Layton asserts that the Commission should have applied the regular legal causation standard to evaluate the incident, rather than the

higher standard that it applied. The applicable legal causation standard in workers' compensation cases depends on whether the injured worker suffers from a preexisting condition and, if so, whether that preexisting condition was caused by a previous workplace accident. We must therefore determine whether the Commission correctly concluded that Layton suffers from a preexisting condition that was not caused by any of the industrial incidents.

¶16 In Utah, workers injured by an industrial "accident arising out of and in the course of" their employment are entitled to workers' compensation benefits under the Utah Workers' Compensation Act. Utah Code Ann. § 34A-2-401(1) (LexisNexis 2015). By its plain language, the statute provides that an injury is compensable only if the injured worker can prove both that the injury was "by accident" and that there is "a causal connection between the injury and the employment." *Allen v. Industrial Comm'n*, 729 P.2d 15, 18 (Utah 1986). "In this context, causation is a two-fold concept encompassing both medical causation and legal causation," *Murray v. Labor Comm'n*, 2012 UT App 33, ¶ 7, 271 P.3d 192, and the injured worker "must supply proof of both" in order to succeed on his claim, *Nyrehn v. Industrial Comm'n*, 800 P.2d 330, 334 (Utah Ct. App. 1990).

¶17 In this case, the "by accident" and medical causation components are not at issue: no party contests the fact that the 2015 Incident was an "accident," or that Layton can demonstrate that his injuries were medically caused, at least in part, by the 2015 Incident.[3] The only contested issue—and the one upon

---

3. Medical causation requires the claimant to show that the injury was caused by work-related exertions. *Cox v. Labor Comm'n*, 2017 UT App 175, ¶ 15, 405 P.3d 863. Here, neither side disputes that Layton's injuries were at least partially caused by work-related exertions, namely, lifting and transporting beer while working for Winkel. Accordingly, it is not necessary to

(continued…)

which the Commission found against Layton—is whether Layton satisfied his burden of proving that his injuries were legally caused by the 2015 Incident. To meet the legal causation requirement, an injured worker must show that the injury for which he or she is seeking compensation "arose out of or in the course of employment." *Allen*, 729 P.2d at 25. Determining legal causation can be difficult in cases "where the employee brings to the workplace a personal element of risk such as a preexisting condition." *Id.*

¶18 In light of this difficulty, the Utah Supreme Court has adopted an approach to determine legal causation that "is dependent on whether a claimant has a preexisting condition," *Fred Meyer v. Industrial Comm'n*, 800 P.2d 825, 829 (Utah Ct. App. 1990) (discussing the holding in *Allen*), as well as on whether the claimant was subjected to extraordinary exertion at work, *see Allen*, 729 P.2d at 25–26. The *Allen* court noted that "[j]ust because a person suffers [from] a preexisting condition, he or she is not disqualified from obtaining compensation," and made clear that "the aggravation or lighting up of a preexisting disease by an industrial accident is compensable." *Id.* at 25 (quotation simplified). The court then articulated a standard to ensure that a claimant's recovery for aggravation of a preexisting condition

_____

(…continued)

interpret or apply the medical causation test articulated in *Cox*. *See id.* ¶ 20 (holding that "to recover for a medical condition, a claimant must show that (1) the industrial accident contributed in any degree to the claimant's condition, such as by aggravating a preexisting condition, and (2) the aggravation is permanent, i.e., the claimant's medical condition never returned to baseline, meaning the claimant's condition immediately before the accident"). We therefore decline Respondents' invitation to use this case to "clarify" certain aspects of our ruling in *Cox*, and we leave any such questions to a future case in which the issue is squarely presented and fully briefed.

would be limited to situations where the "lighting up" was clearly due to workplace demands rather than to day-to-day wear and tear. *Id.* (stating that its standard was intended to "eliminat[e] claims for impairments resulting from a personal risk rather than exertions at work"). Under this framework,

> [t]o meet the legal causation requirement, a claimant with a preexisting condition must show that the employment contributed something substantial to increase the risk he already faced in everyday life because of his condition. This additional element of risk in the workplace is usually supplied by an exertion greater than that undertaken in normal, everyday life.

*Id.* The court summarized its test as follows: "[W]here the claimant suffers from a preexisting condition which contributes to the injury, an unusual or extraordinary exertion is required to prove legal causation. Where there is no preexisting condition, a usual or ordinary exertion is sufficient." *Id.* at 26.

¶19    In *Fred Meyer*, this court held that *Allen*'s heightened legal causation standard applies only if the preexisting condition in question was not itself caused by a separate previous workplace injury. *See Fred Meyer*, 800 P.2d at 830 (stating that "[t]he *Allen* test was not meant to disqualify workers from recovering when their workplace-related preexisting conditions are subsequently aggravated by the same workplace"). For instance, in *Fred Meyer* the Commission determined, as a factual matter, that the claimant's preexisting condition was caused by a previous accident at the same workplace, and on those facts, this court held that the claimant did not need to meet *Allen*'s heightened standard for demonstrating legal causation. *Id.* at 829–30. Thus, the question we must confront is whether, as a factual matter, Layton's DDD was caused by one or more of Layton's previous workplace incidents, or whether Layton's DDD was caused by

factors unrelated to his work. *See id.* at 828 (analyzing first the question of the source of the preexisting condition).

¶20 Layton asserts that "it is abundantly clear" that he did not have a preexisting condition prior to the first incident. He also asserts that any preexisting condition he may have had was the result of his prior industrial incidents. In support of his position he points to x-rays, taken after both the first and second incidents, which show signs of the preexisting condition only after the second incident, as well as the medical opinion of one doctor who opined that Layton did not suffer from a preexisting condition at the time of the first incident.

¶21 The question of whether Layton's DDD was caused by any of his workplace incidents is a factual question and, on such questions, we accord substantial deference to the Commission's factual findings. *Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 10, 317 P.3d 464. We will not disturb the Commission's factual findings "if [they are] based on substantial evidence, even if another conclusion from the evidence is permissible." *Id.* (quotation simplified). Here, the Commission made a specific finding, relying upon the Panel's opinion and other evidence, that "Layton's prior work injuries did not contribute to his underlying degenerative condition."

¶22 In order to prevail on his challenge to that factual finding, Layton must convince us that the Commission's finding was not "based on substantial evidence." *Id.* In an attempt to make this showing, Layton correctly points out that there were several pieces of evidence that support his position, including the opinions of a physician assistant and a doctor, and he continually emphasizes that evidence while attempting to downplay the fact that the record contains significant medical evidence to the contrary.

¶23 For example, among other things, the Commission based its determination on the findings contained in the Panel's report, which concluded that Layton suffered from preexisting DDD

that had not been caused by the incidents. As noted, the Panel report relied on by the Commission was prepared after the Panel, comprised of two impartial doctors, examined Layton, reviewed all of his medical records, and evaluated his relevant medical history. The Commission also evaluated the specific evidence on which Layton relies, including the opinion of the physician assistant, and determined that it was less convincing than the Panel's report.

¶24    In particular, the Commission found the Panel's opinion persuasive in light of the evidence that Layton's initial 2007 work injury was "a muscle strain" and that there had not been "any indication that it affected the underlying degenerative condition in his lumbar spine." And, as the Panel explained, DDD may be caused by "simple wear and tear, or may have a traumatic cause. However, it rarely starts from a major trauma such as a car accident or heavy lifting. It is most likely due to a low energy injury to the disc that progresses with time." In addition, Layton's radiologic studies, performed from 2001 to 2012, also support this conclusion because they "demonstrated progressive development of DDD." Finally, the Commission found that the Panel's opinion was "supported by the evidence in the record" and was "the product of a thorough, well-reasoned, impartial, and collegial review of all of [Layton's] relevant medical history." In contrast, the Commission concluded that the medical opinion of Layton's physician assistant was less credible than the Panel's opinion because the physician assistant "has less specific training than the panel members on the medical aspects of [Layton's] claim."

¶25    Because the evidence was conflicting, the Commission might conceivably have reached a different result. But where the evidence is conflicting, the Commission as factfinder was tasked with finding facts and choosing between conflicting evidence. And here, the Commission's finding is amply supported by evidence in the record, including the Panel's report. In light of this abundant evidence supporting the Commission's finding

that Layton suffered from a non-industrial preexisting condition, Layton has not met his burden of persuading us not to defer to the Commission's factual finding. We therefore credit the Commission's finding that Layton's preexisting DDD was not caused by any of his industrial injuries.

¶26    Because we uphold the Commission's factual finding that Layton suffers from a non-industrial preexisting condition, Layton must meet the higher legal causation standard set forth in *Allen* in order to successfully demonstrate that his injuries were legally caused by the 2015 Incident. *See* 729 P.2d at 25–26; *Fred Meyer*, 800 P.2d at 829–30.

¶27    Unfortunately for Layton, there is no dispute about whether he can meet the higher *Allen* standard for the 2015 Incident: he acknowledges that he cannot, because Layton's actions in lifting the case of beer in January 2015 did not constitute unusual or extraordinary exertion. We therefore have no choice but to conclude that the Commission correctly applied *Allen*'s legal causation standard to the facts of this case. *See* 729 P.2d at 25–26. Accordingly, we decline to disturb the Commission's determination that Layton did not prove legal causation for the 2015 Incident.

CONCLUSION

¶28    The Commission's factual finding that Layton suffered from a preexisting condition that was not caused by his industrial incidents was supported by substantial evidence and is entitled to deference. Because Layton suffered from a non-industrial preexisting condition, he was required to satisfy the higher *Allen* standard for legal causation. By his own admission, Layton cannot meet that standard on the facts of the 2015 Incident, and we therefore decline to disturb the Commission's decision not to award him compensation for injuries sustained in that incident.

_____