2020 UT App 83

# THE UTAH COURT OF APPEALS

MARTHA OCEGUERA,
Petitioner,

*v.*

LABOR COMMISSION AND
THE CORPORATION OF THE PRESIDING BISHOP,
Respondents.

Opinion
No. 20190367-CA
Filed May 29, 2020

Original Proceeding in this Court

Loren M. Lambert, Attorney for Petitioner

Lori L. Hansen and Cody G. Kesler, Attorneys for
Respondent The Corporation of the Presiding Bishop

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

HARRIS, Judge:

¶1  Martha Oceguera injured her knee while working as a seamstress for The Corporation of the Presiding Bishop (CPB), and sought temporary total workers' compensation benefits. The Appeals Board (the Board) of the Utah Labor Commission dismissed Oceguera's claim after determining that she failed to show that her work activity legally caused her injuries. Oceguera asks us to review the Board's determination, and we conclude that the Board erred by rejecting Oceguera's legal causation argument. Accordingly, we set aside the Board's order and return this matter to the Commission for further proceedings.

BACKGROUND

¶2      In 2016, Oceguera was employed as a seamstress at Beehive Clothing, a clothing factory operated by CPB to produce religious garments. Oceguera usually tried to work quickly in order to maximize her production rate, and the nature of the work required her to move quickly from one sewing machine to another. Oceguera was required to depress a foot pedal in order to activate each machine. Most of the foot pedals were covered in "grip tape" to help prevent a worker's foot from slipping, but a few of the pedals had no grip tape.

¶3      On August 20, 2016, Oceguera was hurrying to a table to operate a sewing machine. Once she arrived, she placed the garment on the table and, from a standing posture, applied "significant pressure" to the machine's pedal with her right foot. Oceguera later testified that the pedal in question turned out to be lacking grip tape. In addition, at the moment Oceguera stepped on the pedal, it happened to be covered with "a piece of slippery cloth" that had fallen onto it. As Oceguera applied pressure to the pedal, her right foot "slipped and twisted inward with her toes facing left and her ankle [and] heel facing right." This movement caused a "very strong pain" and a "crack" in the back of Oceguera's right knee, which eventually went numb.

¶4      Oceguera reported the injury to her supervisor, and later went to the hospital for treatment. She was diagnosed with a torn meniscus, which eventually required surgical treatment. Doctors also noticed that Oceguera had preexisting osteoarthritis in the injured knee.

¶5      In November 2016, Oceguera filed an application for workers' compensation benefits, including temporary total disability benefits, related to the August 2016 workplace injury. Following the filing of her claim, medical experts retained by each side independently examined her. CPB's medical consultant, an orthopedic surgeon, concluded that the pain

Oceguera believed was caused by her August 2016 workplace accident was instead attributable to her preexisting osteoarthritis. On the other hand, a chiropractor retained by Oceguera disagreed, and concluded that Oceguera's injury was caused by the workplace accident and that her preexisting condition did not contribute to her injury. In addition, the surgeon who performed Oceguera's meniscus surgery also indicated that her meniscus tear was not caused by any preexisting condition.

¶6     Due to the existence of conflicting medical opinions, an administrative law judge (the ALJ) referred the medical aspects of Oceguera's claim to an impartial medical panel.[1] The panel observed that Oceguera's osteoarthritis pre-dated the August 2016 workplace accident, and concluded that this preexisting condition contributed, in part, to the severity of her meniscal tear. The ALJ credited the medical panel's report, and found that Oceguera had a preexisting condition at the time of the accident that contributed to her injury by "allow[ing] the injury to occur with reduced force" that likely "would not have been sufficient to cause a meniscal tear in a healthy knee." Accordingly, the ALJ determined that, under Utah law, in order to prove that her injury was legally caused by the workplace accident, Oceguera would have to "show that the employment contributed something substantial to increase the risk [she] already faced in everyday life because of [her preexisting] condition." *See Allen v. Industrial Comm'n*, 729 P.2d 15, 25 (Utah 1986). In the ALJ's view,

---

1. Under Utah law, an ALJ may refer medical aspects of a case to a panel of qualified medical professionals specializing in the treatment of the disease or condition involved in the claim. Once the panel has submitted their report, the ALJ may base his or her findings on the report of the medical panel if the ALJ determines that the panel's conclusions are credible. *See* Utah Code Ann. § 34A-2-601(1)(c), (2)(e)(i) (LexisNexis 2015).

Oceguera could not meet that standard; the ALJ determined that "[t]he act of one's foot slipping in a limited manner on a slippery surface is a common place occurrence in modern, non-employment life," and that the "physical exertion" Oceguera faced did "not exceed" the usual and customary activities of daily life in the modern world. The ALJ also determined that "the force with which [Oceguera] slipped and twisted her knee would not have been sufficient to cause a meniscal tear in a healthy knee, but her pre-existing condition allowed the injury to occur with reduced force." The ALJ therefore dismissed Oceguera's request for benefits.

¶7 Oceguera appealed the ALJ's decision to the Board, arguing that her osteoarthritis was not the type of preexisting condition that triggers the heightened *Allen* standard, and arguing that she could in any event demonstrate legal causation. However, a majority of the Board adopted the ALJ's findings and upheld the ALJ's decision, concluding that Oceguera could not show legal causation because the workplace activity that led to the injury did not involve "an unusual or extraordinary exertion above the usual wear and tear of nonemployment life," and opining that "[i]t is not unusual for a person to hurry and then step on a surface and have one's foot slip off and twist to the side such as when a person hurries to cross a street and his or her foot slips off a street curb or hurries to catch a bus or train and then slips while boarding." One member of the Board dissented, opining that the majority was too "obsessed with the 'mechanism of injury'" and had not focused enough on the "environs of the work place."

ISSUES AND STANDARDS OF REVIEW

¶8 Oceguera now asks us to review two aspects of the Board's order. First, Oceguera asserts that the heightened *Allen* standard for legal causation does not apply here. Second, Oceguera argues that, even if *Allen* applies, she can satisfy its

test, asserting that, under the totality of the circumstances presented, her "employment contributed something substantial to increase the risk she already faced in everyday life" due to her osteoarthritis, *see Allen v. Industrial Comm'n*, 729 P.2d 15, 25 (Utah 1986), and that her meniscus tear was therefore legally caused by the workplace accident. Both of these issues involve questions on which we owe no deference to the Board's conclusions. The first issue requires us to interpret the scope of a Utah Supreme Court opinion, a subject on which we do not defer to lower tribunals. *Ortega v. Ridgewood Estates LLC*, 2016 UT App 131, ¶ 29, 379 P.3d 18 ("The district court's interpretation of caselaw presents a question of law, which we review for correctness."). And our supreme court has determined that, in making a determination about whether a workplace situation presents unusual conditions not present in everyday life, "the ultimate question is the legal effect of the facts rather than witness credibility or demeanor," and that "unusualness" is "an objective legal standard that we are in a better position to analyze than the [Labor] Commission." *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 40, 308 P.3d 461.

ANALYSIS

¶9     In Utah, workers' compensation benefits are available to any employee injured in an "accident arising out of and in the course of" employment. Utah Code Ann. § 34A-2-401(1) (LexisNexis 2015). For an injury to be compensable, the worker must prove both that the injury was "by accident" and that there is "a causal connection between the injury and the employment." *Allen*, 729 P.2d at 18. "In this context, causation is a two-fold concept encompassing both medical causation and legal causation," *Layton v. Labor Comm'n*, 2019 UT App 59, ¶ 16, 440 P.3d 954 (quotation simplified), and the injured worker "must supply proof of both" in order to succeed on her claim, *Nyrehn v. Industrial Comm'n*, 800 P.2d 330, 334 (Utah Ct. App. 1990).

¶10     In this case, CPB does not contest the fact that Oceguera's injury happened "by accident," nor does it—at least not in its briefing before this court—contest that Oceguera's injury was medically caused by the August 2016 accident. The only issue contested here is the one on which the Board rejected Oceguera's claim: whether Oceguera has satisfied her burden of proving that her injuries were legally caused by her workplace accident.

¶11     In order to show legal causation, Oceguera must show that her injury arose "out of and in the course of" her employment. *See* Utah Code Ann. § 34A-2-401(1); *see also Allen*, 729 P.2d at 25. Our supreme court has noted the difficulty in determining causation in cases "where the employee brings to the workplace a personal element of risk such as a preexisting condition." *Id.* Injured employees are "not disqualified from obtaining compensation" just because they have preexisting conditions that contributed to their injuries, and can even recover for the "aggravation or lighting up of a pre-existing disease." *Id.* (quotation simplified). However, such employees must demonstrate that their injury or aggravation was due to workplace activity rather than day-to-day wear and tear; for that reason, a heightened test for legal causation is "necessary to distinguish those injuries which coincidentally occur at work because a preexisting condition results in symptoms which appear during work hours without any enhancement from the workplace." *See Murray v. Labor Comm'n*, 2013 UT 38, ¶ 46, 308 P.3d 461 (quotation simplified). In order to meet the heightened test, claimants "must show that the employment contributed something substantial to increase the risk [they] already faced in everyday life because of [their] condition." *Allen*, 729 P.2d at 25. "This additional element of risk in the workplace" can be satisfied by evidence that the injury occurred as the result of "an exertion greater than that undertaken in normal, everyday life." *Id.* In summary, "where the claimant suffers from a preexisting condition which contributes to the injury, an unusual or extraordinary exertion is required to prove legal causation," but

"[w]here there is no preexisting condition, a usual or ordinary exertion is sufficient." *Id.* at 26.

¶12 As noted above, the ALJ and the Board both determined that Oceguera had to satisfy the *Allen* test, and that she could not do so under the facts of this case. Oceguera takes issue with that determination, asserting first that the *Allen* test does not apply to her case, and arguing in the alternative that, on the facts presented here, the test is satisfied in any event. We address each of Oceguera's arguments in turn.

A

¶13 A workers' compensation claimant must satisfy the *Allen* test anytime "the claimant suffers from a preexisting condition which contributes to the injury." *Allen*, 729 P.2d at 26. In this case, the Board made factual findings that both (a) Oceguera suffered from preexisting osteoarthritis, and (b) her preexisting condition contributed to her injury by "making her more susceptible to the meniscal tear" and allowing her meniscus to "be torn with less force than would normally be required for such a tear." Oceguera does not contest these factual findings; indeed, she acknowledges that she had preexisting osteoarthritis, and that her condition "allowed her meniscus to be torn with less force than in a healthy knee." However, she argues that her preexisting condition "was insignificant or trivial," and is not "the type that requires the higher legal causation standard." She asserts that, for the *Allen* standard to apply, the preexisting condition must be "a significant or substantial cause of the workplace injury."

¶14 But this requirement appears nowhere in existing case law discussing legal causation of a workplace injury involving

an employee with a preexisting condition.[2] In *Allen* itself, our supreme court indicated that the more stringent legal causation test applies "where the claimant suffers from a preexisting condition which contributes to the injury"; the court did not make any effort to limit the test's application to cases where the preexisting condition's contribution was significant or substantial. *See Allen*, 729 P.2d at 26. Since *Allen*, our supreme court has continued to apply the test when the preexisting condition "causally contributed to" the injury, *see Murray*, 2013

---

2. Oceguera directs our attention to *Washington County School District v. Labor Commission*, 2015 UT 78, 358 P.3d 1091. In that case, our supreme court analyzed the "causal connection required between an initial workplace injury and a subsequent non-workplace injury to allow workers' compensation benefits for the second injury." *Id.* ¶ 19. In that context, an employee must show that "the original workplace injury was a significant contributing cause of the subsequent non-workplace injury," and it is not enough for the employee to show that the initial workplace injury was "a mere contributing cause." *Id.* In *Washington County*, the supreme court did not cite *Allen*, and did not state or imply that the test it applied would apply outside the subsequent-non-workplace-injury context. And we are not aware of any Utah court applying this standard in a case analyzing the impact of a preexisting condition on a workplace injury. And in any event, the *Allen* test itself already absolves an employer from paying benefits to an employee with a preexisting condition who was injured in the workplace unless "the employment contributed something substantial to increase the risk" the employee already faced due to the preexisting condition. *See Allen v. Industrial Comm'n*, 729 P.2d 15, 25 (Utah 1986). We do not perceive the *Allen* test, as presently constituted, to contain a second level of inquiry aimed at evaluating the qualitative nature of the causal link between the preexisting condition and the injury.

UT 38, ¶ 45, and so have we, *see, e.g.*, *Acosta v. Labor Comm'n*, 2002 UT App 67, ¶ 25, 44 P.3d 819 (stating that "[t]he sole question is whether the worker came to the workplace with a condition that increased his risk of injury," and that "[i]f he did and that condition contributed to the injury, then *Allen*'s higher standard of legal causation comes into play" (quotations simplified)).

¶15 We are, of course, bound to follow *Allen* and *Murray*, because they represent the pronouncements of a higher court. *See Ortega v. Ridgewood Estates LLC*, 2016 UT App 131, ¶ 30, 379 P.3d 18 ("[W]e are bound by vertical stare decisis to follow strictly the decisions rendered by the Utah Supreme Court." (quotation simplified)). To the extent Oceguera is simply making a record to preserve her right to ask the supreme court to revisit *Allen*, we acknowledge her efforts. But we are not empowered to revisit Utah Supreme Court precedent, and we may not add a threshold element—that the contribution made by the preexisting condition be "significant" or "substantial"—to a test articulated by that court.[3]

¶16 Given that the *Allen* test applies, by its terms, anytime a preexisting condition contributes to a workplace injury, and given that the Board made unchallenged findings that Oceguera

---

3. Given that our case law contains no requirement that the contribution to the injury made by the preexisting condition be substantial, none of the experts involved in the case offered a specific opinion, one way or the other, on that question. Oceguera's expert opined that the preexisting condition made no contribution at all to her injury. And the medical panel, in an opinion shared by CPB's expert, opined that Oceguera's osteoarthritis "allowed the meniscus to be torn with less force" than in a healthy knee, but did not analyze whether the osteoarthritis's contribution was "significant" or "substantial."

suffered from a preexisting condition that contributed, at least in part, to her injury, the *Allen* test applies here. Oceguera cannot demonstrate that her injury was legally caused by the workplace accident without satisfying that test.

B

¶17    Under that test, because she came to the workplace with a preexisting condition, Oceguera may recover workers' compensation benefits only if she can show that "the employment contributed something substantial to increase the risk [she] already faced in everyday life because of [her] condition." *See Allen*, 729 P.2d at 25. To make this showing, Oceguera must compare the circumstances of the workplace injury to the "exertions" of a typical person's "nonemployment life," and persuade us that her injury was caused "by an exertion greater than that undertaken in normal, everyday life." *Id.* at 25–26. This endeavor involves two steps: "first, we must characterize the employment-related activity that precipitated the employee['s] injury, taking into account the totality of the circumstances; and second, we must determine whether this activity is objectively unusual or extraordinary." *Murray*, 2013 UT 38, ¶ 48.

¶18    The facts related to the mechanism of injury, as determined by the Board, are not a matter of much dispute. As noted above, in an effort to maximize her production rate, Oceguera was attempting to work quickly, and she "hurried to a sewing table to operate a sewing machine." Upon arriving at the table, she "applied significant pressure" on the machine's pedal with her right foot. Unbeknownst to Oceguera, the pedal in question had no grip tape, and was covered with a stray piece of cloth. As she pressed the pedal, her foot slipped off of it and twisted inward, causing immediate pain and tearing the meniscus in her right knee.

¶19   The parties do, however, dispute the legal import of these facts. The ALJ and a majority of the Board determined that the activity required of Oceguera in the workplace was not unusual or extraordinary, when compared with typical non-employment life; the Board analogized the foot-pedal mishap to situations in which a person is in a hurry—for instance, crossing a street or trying to catch a bus—and then "step[s] on a surface" and slips. CPB agrees, asserting that Oceguera's workplace activity "is not unusual compared with normal nonemployment exertions experienced by the general public in today's society." Oceguera, on the other hand, points to the specific circumstances of her workplace, in which she—in an effort to maximize her production—was hurrying to get to the next workstation, and notes that the pedal in question was covered by a slippery piece of cloth, and turned out to have no grip tape beneath the cloth. She also notes the "significant pressure" that she applied to the pedal, and asserts that the workplace activity that led to her accident, when viewed in its entirety, is more strenuous than the activities of normal everyday non-employment life.

¶20   The second part of the legal causation test—the inquiry into the "unusualness" of the workplace activity—is an objective assessment. *See Murray*, 2013 UT 38, ¶ 48. In comparing "the activity that precipitated the employee's injury with the usual wear and tear and exertions of nonemployment life," we focus on "what typical non-employment activities are generally expected of people in today's society, not what this particular claimant is accustomed to doing." *Id.* (quotations simplified). In making this comparison, we examine "the totality of the circumstances, including the employee's exertions and the workplace conditions." *Id.* ¶ 47. These examinations are quite specific. For instance, under the facts of *Allen*, our supreme court noted that the assessment should take into account not just how much weight the employee lifted and moved, but specifically "how many crates were moved . . . , the distance the crates were moved, the precise weight of the crates, and the size of the area

in which the lifting and moving took place." *See Allen*, 729 P.2d at 28. And in *Murray*, the court took into account more than just the fact that the employee lost his balance in a boat; it also considered the angle at which he was "bent over the edge of the boat," the fact that he "was wearing a fifteen-pound service belt and a one-pound inflatable life jacket, and that the wave that hit his boat was unexpected." *See Murray*, 2013 UT 38, ¶ 50.

¶21 In addition to *Allen* and *Murray*, we find two of our own cases instructive here. In *Peterson v. Labor Commission*, 2016 UT App 12, 367 P.3d 569, an employee with a preexisting condition in her right shoulder worked in a grocery store's bakery department as a cake decorator, and her "regular duties included lifting and moving cakes and buckets of frosting." *Id.* ¶¶ 2, 4. The cakes "weighed about four pounds each, and the buckets of frosting weighed as much as forty-two pounds." *Id.* One day, the claimant sustained an injury to her right rotator cuff after she "reached behind her with her arm extended like a waiter" in order "to remove a tray of cakes from a rack." *Id.* ¶¶ 3, 16. The tray in question contained four cakes, "weighed over sixteen pounds, and was positioned about shoulder-height on the rack." *Id.* ¶ 3. The Board denied her claim for workers' compensation benefits under *Allen*, concluding that her "exertion was not unusual or extraordinary." *Id.* ¶ 9. This court disagreed, focusing not just on the amount of weight lifted but on the totality of the circumstances, including "the awkward manner" in which the employee lifted the tray. *Id.* ¶ 15. We summed up our conclusion as follows: "Looking at the totality of the circumstances of [the employee's] injury, we are satisfied that her lifting of the sixteen-pound cake tray in the peculiar manner that she did 'contributed something substantial to increase the risk she already faced in everyday life because of her preexisting condition.'" *Id.* ¶ 16 (quoting *Allen*, 729 P.2d at 25) (quotation simplified)).

¶22 In *American Roofing Co. v. Industrial Commission*, 752 P.2d 912 (Utah Ct. App. 1988), we addressed a claim for workers' compensation involving an employee with a preexisting back condition who was injured while lifting a thirty-pound bucket from the back of a truck. *Id.* at 913. As the employee leaned over the side of the truck and attempted to lift the bucket out of the truck bed, "the bucket snagged on something," and the employee experienced "lightning bolts" of pain through his back and legs. *Id.* This court applied *Allen* and declined to disturb the Board's conclusion that the employee's exertion was unusual and extraordinary. *Id.* at 915. The Board had concluded that "evidence of the weight, together with the manner in which [the employee] lifted the bucket and the fact that the bucket snagged, combined to characterize [his] action as unusual or extraordinary under the *Allen* definition." *Id.*

¶23 Applying this test, and this case law, to the facts of this case, we conclude that Oceguera has established that her injury was legally caused by the August 2016 workplace accident. In our view, after examining the circumstances of Oceguera's accident in their totality, we are persuaded that the exertion expended by Oceguera in the course of her accident was greater than that usually undertaken by an average person in non-employment life. *See Murray*, 2013 UT 38, ¶ 47; *Allen*, 729 P.2d at 28. In an effort to maximize her production rate, Oceguera was hurrying to the next station. She applied "significant pressure" to the foot pedal. And that foot pedal, unbeknownst to her, was more slippery than she was anticipating, since it had no grip tape and was covered by a stray piece of cloth. In the course of daily non-employment life, people do not typically encounter situations like that.

¶24 We disagree with the Board's conclusion that Oceguera's exertion was comparable to slipping while walking or boarding a bus. As an initial matter, we are not convinced that taking a step on level ground, or even stepping upward to board a bus or

mount a flight of stairs, is the same as applying "significant pressure" to the foot pedal of an industrial sewing machine. Moreover, Oceguera was hurrying from station to station in an effort to maximize her production rate. We certainly acknowledge that ordinary people in non-employment life sometimes find it necessary to depress foot pedals using "significant pressure," and sometimes find it necessary to hurry. But most people do not encounter those things very often in non-employment life, especially at the same time, and Oceguera was required to do so constantly throughout her workday—hour after hour, garment after garment. *See Fastenal v. Labor Comm'n*, 2020 UT App 53, ¶ 15 ("Repetition of a workplace activity can constitute an objectively unusual or extraordinary exertion."), *petition for cert. filed*, May 20, 2020 (No. 20200409); *see also Miera v. Industrial Comm'n*, 728 P.2d 1023, 1024–25 (Utah 1986) (holding that an employee's repeated "jumps into an eight-foot hole from a four-foot platform at thirty-minute intervals constitute[d] a considerably greater exertion than that encountered in nonemployment life").

¶25 But perhaps most significant, in light of *Peterson* and *American Roofing*, is the unanticipated manner in which her foot slipped off of the pedal. In those cases, it was "the unusual and awkward manner in which the employee lifted an otherwise-manageable amount of weight" that helped differentiate the workers' exertions from those typically encountered in non-employment life. *See Peterson*, 2016 UT App 12, ¶ 16. Similarly here, Oceguera did not expect the pedal to be slippery from lack of grip tape and from the presence of the stray piece of cloth. Encountering a pedal with those characteristics was unusual and extraordinary, even for Oceguera, who was used to depressing foot pedals often during her work; it is certainly out of the ordinary for anyone in non-employment life to unexpectedly encounter such a situation. In *Peterson*, we concluded that the employee's "activity when she was injured—twisting and reaching behind herself with her extended right arm to place her

palm under a sixteen-pound cake tray to lift and move it from a shoulder-height rack to a mid-chest height table—was objectively unusual or extraordinary." *See id.* ¶ 13. And in *American Roofing*, we determined that "the manner in which the bucket snagged" on the truck bed, when "combined" with its thirty-pound weight, was "unusual or extraordinary under the *Allen* definition." *See American Roofing*, 752 P.2d at 915.

¶26 Oceguera's exertion was at least as awkward and unusual as the activities at issue in *Peterson* and *American Roofing*. Neither Oceguera nor the worker in *American Roofing* anticipated the difficulty of their activity: the worker did not know that the bucket would snag on the truck, and Oceguera did not know that her foot pedal was especially slippery. And unlike the activity in *Peterson*, Oceguera's activity was more or less required by the nature of the job: she was hurrying to maximize her production rate, and she had to depress the foot pedal with "significant pressure" to complete her task. The employee in *Peterson* was required to lift the cake tray, but was not required to lift it in the awkward manner she selected; we nevertheless found her activity to be unusual or extraordinary. *See Peterson*, 2016 UT App 12, ¶ 16.

¶27 The ultimate question *Allen* asks us to answer is this one: did the demands of Oceguera's employment "contribute[] something substantial to increase the risk [she] already faced in everyday life because of" her osteoarthritis? *See Allen*, 729 P.2d at 25. And on the facts of this case, taking into account the totality of the circumstances, we answer that question in the affirmative.

CONCLUSION

¶28 Because her preexisting osteoarthritis contributed to her workplace injury, Oceguera must meet *Allen*'s heightened legal causation standard in order to prevail on her claim for workers' compensation benefits. Oceguera's request that we apply the

*Allen* test only where the worker's preexisting condition made a significant or substantial contribution to the workplace injury is a request more appropriately directed to our supreme court.

¶29    But Oceguera can meet the *Allen* test, under the facts of this case. After examining the totality of the circumstances, we conclude that the exertions she expended in sustaining the injury are not the sort of exertions one typically makes in everyday non-employment life, and that therefore the demands of her employment, on this particular occasion, substantially increased the injury risk she already faced due to her preexisting osteoarthritis. Accordingly, Oceguera has established that her workplace activity was the legal cause of her injury. We therefore set aside the Board's order and return this matter to the Labor Commission for further proceedings.

—————